# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
#### 1:08cv371

| | |
|---|---|
| ARGONAUT GREAT CENTRAL<br>INSURANCE COMPANY,<br><br>       Plaintiff,<br><br>Vs.<br><br>MCDOWELL COUNTY; DUDLEY<br>GREENE, in his official capacity as Sheriff<br>of McDowell County; JAMES BRANDON<br>WATSON, in his official capacity as a<br>Deputy with the McDowell County Sheriff's<br>Office; KIMBERLY D. FRYE and DAVID<br>L. FRYE as Co-Administrators of the Estate<br>of Kennedy Elizabeth Frye; KATHERINE<br>ELIZABETH FRYE; BRUCE A. ELMORE,<br>JR., as Guardian Ad Litem for Katherine<br>Elizabeth Frye, a minor; KIMBERLY D.<br>FRYE; DAVID L. FRYE; RUTH ANN<br>HUSKINS; and RONNIE HUSKINS,<br><br>       Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)     **MEMORANDUM**<br>)     **OF DECISION**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**THIS MATTER** is before the court in accordance with 28, United States

Code, Section 636(c), and on the Frye defendants' Motion to Dismiss Civil Action

Under 28 U.S.C. § 2201 (#34). Plaintiff timely filed its Response (#42) and the Frye

defendants timely filed their Reply (#44). Having carefully considered the well

reasoned briefs of all the parties as well as considered all the pleadings in this matter, the court will decline to exercise jurisdiction under 28, United States Code, Section 2201 for the reasons which follow.

## FINDINGS AND CONCLUSIONS

### I. Nature of the Action

This action involves the scope of coverage of a policy of insurance (Policy No. PE-4601244-04) issued by plaintiff to defendant McDowell County. Compl., at ¶ 13. It is undisputed that the policy consists of two "parts": the first part provides commercial automobile coverage; and the second part provides law enforcement liability coverage. Id. Plaintiff does not dispute that such policy provides liability coverage for defendants Dudley Greene (in his official capacity as the present Sheriff of McDowell Country), James Brandon Watson (in his official capacity as a former Deputy Sheriff of McDowell County), and McDowell County. Plaintiff does, however, dispute the coverage available under the policy as well as the Frye's and the Huskins' contention that two accidents occurred.

More specifically, plaintiff herein contends that its limit of liability under the policy is $1,000,000.00 for the injuries sustained by the Fryes and the Huskins on or about February 6, 2007. Compl., at ¶ 18. More specifically, plaintiff contends that

there was a single "accident" under the commercial auto coverage part of the Argonaut Policy, and the $1,000,000 per accident limit of liability under that coverage part applies to all claims resulting from the February 6, 2007 event.

Compl., at 19. Pursuant to Section 2201, plaintiff then asks this court to

> declare the rights and obligations of the parties, including that one "accident" occurred under the commercial auto coverage part of the Argonaut Policy, that the auto use exclusion of the law enforcement liability coverage part of the Argonaut Policy precludes the Underlying Plaintiffs' claims, and that Argonaut has no obligation to defend or indemnify McDowell County for the claims in the Underlying Complaints beyond $1,000,000;
>
> 2. That, in the alternative, the Court declare that Argonaut is only obligated to pay under any limit of liability applicable to a second accident those damages, if any, that were the result of any purported second accident; and in any event that Argonaut has no obligation to indemnify McDowell County for the claims in the Underlying Complaints beyond $2,000,000 per the "Two or More Policies or Coverage Parts or Coverage Forms" endorsement of the Argonaut Policy . . . .

Compl., ¶ 1 & 2 of the Prayer for Relief.

In response to the Complaint, the Frye and Huskins defendants have filed counterclaims in which they first contend that plaintiff is liable for $2,000,000.00 under the automobile part of the policy because two accidents occurred and seek a declaration from this court to such effect. The Huskins defendants also seek a

declaration that the law enforcement part of the policy provides $2,000,000.00 in additional coverage.[1]

At the base of the dispute is the Fryes' and Huskins' contention that they were injured in two accidents caused by the negligence of Deputy Watson, not one. Drawing from the pleadings, it appears that the Fryes and Huskins sustained personal injuries and that the Frye's child was killed when an insured vehicle operated by Deputy Watson collided with their vehicle and they were soon thereafter hit by a third vehicle being operated by a private party.[2]  The Fryes and Huskins contend that the first impact came as a result of Deputy Watson's negligent operation of the insured McDowell County vehicle and that the second impact, a few minutes later, was proximately caused by Deputy Watson's additional or further negligence in attempting to alert and warn oncoming traffic of the accident.  Based on this theory of two automobile accidents caused by the negligence of Deputy Watson, such defendants contend that plaintiff is obligated to indemnify the insured county for $2,000,000.00 inasmuch as there were two occurrences under the automobile part of

---

[1]      The Fryes no longer contend herein that the law enforcement policy provides any coverage inasmuch as they dismissed their negligent traffic control claim in the underlying state lawsuit.

[2]      The court does not intend to bind the parties, this court, or any other court with any recitation contained herein of the factual basis of this action.  Such recitations are not based on any review of the evidence presented in the underlying action and are merely intended to aid this court in deciding whether to dismiss this action.

the policy.  Id., at ¶ 15.  The Huskins contend that plaintiff is also liable for indemnification up to $2,000,000.00 on the law enforcement part of the policy.

## II.    The Underlying State Court Actions

There are two underlying state court actions, hereinafter referred to the "Frye Action" and the "Huskins Action."  Both actions are pending before Honorable James L. Baker, Jr., North Carolina Superior Court Judge.  In the Frye Action, a verdict has been returned providing an award of damages against the county defendants in the amount of $5,500,000.00.  The Huskins Action, which was filed as a separate action inasmuch as Mrs. Huskins, who is Mrs. Frye's mother-in-law, was a guest passenger in the Frye automobile. The Huskins action has not yet been tried, but it appears undisputed that such action may well amicably resolve when Judge Baker enters judgment in the Frye matter.

Upon the return of the verdict in the Frye Action, Judge Baker promptly scheduled a hearing to determine the extent of the county defendants' waiver of governmental immunity and to enter his judgment upon the jury's verdict.  Such hearing to determine the extent of governmental waiver of immunity through the purchase of liability insurance is required by Chapter 153A-435(b) of the North Carolina General Statutes, which provides as follows:

## § 153A-435.  Liability insurance; damage suits against a county involving governmental functions.

(a)     A county may contract to insure itself and any of its officers, agents, or employees against liability for wrongful death or negligent or intentional damage to person or property or against absolute liability for damage to person or property caused by an act or omission of the county or of any of its officers, agents, or employees when acting within the scope of their authority and the course of their employment. The board of commissioners shall determine what liabilities and what officers, agents, and employees shall be covered by any insurance purchased pursuant to this subsection.

Purchase of insurance pursuant to this subsection waives the county's governmental immunity, to the extent of insurance coverage, for any act or omission occurring in the exercise of a governmental function. Participation in a local government risk pool pursuant to Article 23 of General Statute Chapter 58 shall be deemed to be the purchase of insurance for the purposes of this section. By entering into an insurance contract with the county, an insurer waives any defense based upon the governmental immunity of the county.

If a county uses a funded reserve instead of purchasing insurance against liability for wrongful death, negligence, or intentional damage to personal property, or absolute liability for damage to person or property caused by an act or omission of the county or any of its officers, agents, or employees acting within the scope of their authority and the course of their employment, the county board of commissioners may adopt a resolution that deems the creation of a funded reserve to be the same as the purchase of insurance under this section. Adoption of such a resolution waives the county's governmental immunity only to the extent specified in the board's resolution, but in no event greater than funds available in the funded reserve for the payment of claims.

(b)     If a county has waived its governmental immunity pursuant to subsection (a) of this section, any person, or if he dies, his personal representative, sustaining damages as a result of an act or omission of the county or any of its officers, agents, or employees, occurring in the exercise of a governmental function, may sue the county for recovery of damages. To the extent of the coverage of insurance purchased pursuant

to subsection (a) of this section, governmental immunity may not be a defense to the action. Otherwise, however, the county has all defenses available to private litigants in any action brought pursuant to this section without restriction, limitation, or other effect, whether the defense arises from common law or by virtue of a statute.

Despite the purchase of insurance as authorized by subsection (a) of this section, the liability of a county for acts or omissions occurring in the exercise of governmental functions does not attach unless the plaintiff waives the right to have all issues of law or fact relating to insurance in the action determined by a jury. The judge shall hear and determine these issues without resort to a jury, and the jury shall be absent during any motion, argument, testimony, or announcement of findings of fact or conclusions of law relating to these issues unless the defendant requests a jury trial on them. (1955, c. 911, s. 1; 1973, c. 822, s. 1; 1985 (Reg. Sess., 1986), c. 1027, s. 27; 2003-175, s. 2.)

N.C.Gen.Stat. § 153A-435. Judge Baker has, however, stayed his hand in determining the waiver of governmental immunity, entering his judgment, and setting the Huskins Action for trial based on the pendency of this action.

## III. Standard Applicable to a Motion to Dismiss a Section 2201 Action

The filing of a declaratory judgment action under 28, United States Code, Sections 2201-2202, does not in and of itself confer jurisdiction. <u>Schilling v. Rogers</u>, 363 U.S. 666, 667 (1960); <u>Delavigne v. Delavigne</u>, 530 F.2d 598, 601 (4th Cir.1976). Instead, a district court may entertain a declaratory judgment action before it where the claim amounts to a "case of actual controversy" within the court's diversity jurisdiction. <u>Nautilus Ins. Co. v. Winchester Homes, Inc.</u>, 15 F.3d 371, 375 (4th

Cir.1994), *overruled on other grounds*, <u>Wilton v. Seven Falls Co.</u>, 515 U.S. 277

(1995).  The Court of Appeals for the Fourth Circuit has held that a

declaratory judgment action is appropriate "when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and ... when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." It should not be used "to try a controversy by piecemeal, or to try particular issues without settling the entire controversy, or to interfere with an action which has already been instituted." **The Supreme Court explained that, when a related state proceeding is underway, a court considering a declaratory judgment action should specifically consider whether the controversy "can better be settled in the proceeding pending in the state court."** This consideration should be guided by a number of factors, including the nature and scope of the state proceeding and "whether the claims of all parties in interest can satisfactorily be adjudicated in that proceeding...."

Guided by these general principles--as well as "the same considerations of federalism, efficiency, and comity that traditionally inform a federal court's discretionary decision whether to abstain from exercising jurisdiction over state-law claims in the face of parallel litigation in the state courts"-- the Fourth Circuit has set forth a number of specific factors for district courts to consider. These include: (i) the strength of the state's interest in having the issues raised in the federal declaratory action decided in the state courts; (ii) whether the issues raised in the federal action can more efficiently be resolved in the court in which the state action is pending; (iii) whether permitting the federal action to go forward would result in unnecessary "entanglement" between the federal and state court systems, because of the presence of "overlapping issues of fact or law" [; and (iv) ] whether the declaratory judgment action is being used merely as a device for "procedural fencing"--that is, "to provide another forum in a race for *res judicata*" or "to achiev[e] a federal hearing in a case otherwise not removable."

Centennial Life Ins. Co. v. Poston, 88 F.3d 255, 256-57 (4th Cir. 1996)(citations omitted; emphasis added). In Wilton, supra, the United States Supreme Court reaffirmed Brillhart v. Excess Ins. Co., 316 U.S. 491(1942), where the district court dismissed the action because of ongoing state litigation. According to the Wilton Court, the proposition in Brillhart that was reaffirmed was

> where another suit involving the same parties and presenting opportunities for ventilation of the same state law issues is pending in state court, a district court might be indulging in 'gratuitous interference,' if it permitted the federal declaratory action to proceed.

Wilton, supra, at 283 (citation omitted). The Wilton Court concluded that the district courts possess wide discretion in making these decisions holding as follows:

> [c]onsistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment before trial or after all arguments have drawn to a close. In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration.

Id., at 288. The appellate court recognized that to whatever extent its decisions implied further restrictions on district court discretion in determining whether to exercise jurisdiction over Declaratory Judgment Act cases, such decisions must yield to the clear decision of the Supreme Court in Wilton. Centennial, supra, at 257-258.

## IV.    Discussion

**A.     Introduction**

Clearly, this court has diversity jurisdiction over plaintiff's claims and the Western District of North Carolina would be an appropriate venue for this declaratory judgment action to be resolved. The only issue before the court is whether this court should exercise its jurisdiction by adjudicating this Declaratory Judgment Action or whether such principle should yield to considerations of practicality and wise judicial administration. <u>Wilton</u>, <u>supra</u>.

Because the Declaratory Judgment Act may run head long into ongoing state court actions, federal courts mus exercise discretion in determining whether to allow the federal action to proceed even though the suit otherwise satisfies the requirements of federal subject matter jurisdiction. <u>Id.</u>, at 282; <u>Aetna Casualty and Surety v. Alpha Mechanical, Inc.</u>, 9 F.Supp.2d 585, 587 (W.D.N.C. 1998). "[A] district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment before trial…." <u>Wilton</u>, <u>supra</u>, at 288. When deciding whether to allow the continuation of a federal action which parallels a state court proceeding, courts consider "whether the controversy can better be settled in the proceeding pending in the state court." <u>Centennial Life Insurance Company v. Poston</u>, 88 F.3d 255, 256 (4th Cir. 1996). The overriding concern is whether "the claims of all parties in interest can satisfactorily be adjudicated in [the state court]

proceeding…." <u>Wilton</u>, <u>supra</u>, at 283. As mentioned above in discussing the applicable standard, the Supreme Court has specifically cautioned and reaffirmed that where there is

> another suit involving the same parties and presenting opportunity for ventilation of the same state law issues is pending in state court, a district court might be indulging in 'gratuitous interference' if it permitted the federal declaratory action to proceed.

<u>Id.</u> (citation omitted).

Inasmuch as discretion is not, by its nature, capable of being quantified or limited to rote inquiries, <u>see</u> <u>Centennial</u>, <u>supra</u>, the inquiry is aided by consideration of a number of specific factors. <u>See</u> <u>Nautilus Ins. Co. v. Winchester Homes, Inc.</u>, 15 F.3d 371, 376 (4th Cir. 1994). These factors, known as the <u>Nautilus</u> factors include:

(1) the strength of the state's interest in having the issues raised in the federal declaratory action decided in the state courts;

(2) whether the issues raised in the federal actions can more efficiently be resolved in the court in which the state action is pending;

(3) whether permitting the federal action to go forward would result in unnecessary entanglement between the federal and state court systems, because of the presence of overlapping issues of fact or law; and

(4) whether the declaratory judgment action is being used merely as a device for procedural fencing—that is, to provide another forum in a race for *res judicata* or to achieve a federal hearing in a case otherwise not removable.

Id., at 257 (citations and corresponding quotation marks omitted). While the court will not limit its inquiry to these factors alone, the undersigned will consider each Nautilus factor *seriatim* and use them as a framework in determining whether to exercise discretion in favor of retaining the action.

**B.  The First Factor: North Carolina's Interest in the Subject Matter of this Declaratory Judgment Action.**

The first factor to consider is the forum state's interest in the subject matter of the declaratory judgment action pending in federal court, which is limit of indemnification provided under a contract of insurance to a North Carolina county. First, North Carolina has made most clear its interest in the legal relationships that develop from insurance policies:

> Generally, an insurance contract "is subject" to the law of the state where the contract was entered. All contracts of insurance on "property, lives, or interests" that have a close connection with North Carolina are deemed to have been entered in this state.

Fortune Ins. Co. v. Owens, 132 N.C.App. 489, 492 (N.C. App.1999)(citations omitted).  Beyond such a general interest in insurance policies, North Carolina appears to have a particular interest in the limits of indemnification of a policy of liability insurance purchased by a county.  Chapter 153A-435 provides in pertinent part that:

Purchase of insurance pursuant to this subsection waives the county's governmental immunity, to the extent of insurance coverage, for any act or omission occurring in the exercise of a governmental function.

N.C.Gen.Stat. § 153A-435(a). Further, North Carolina has such a fundamental interest in contracts providing liability insurance to counties that it requires claimants against such counties to forfeit fundamental constitutional rights to trial by jury and to submit certain issues relating to insurance determined by the trial judge:

**Despite the purchase of insurance** as authorized by subsection (a) of this section, the **liability of a county for acts or omissions occurring in the exercise of governmental functions does not attach unless the plaintiff waives the right to have all issues of law or fact relating to insurance in the action determined by a jury**. The judge shall hear and determine these issues without resort to a jury, and the jury shall be absent during any motion, argument, testimony, or announcement of findings of fact or conclusions of law relating to these issues unless the defendant requests a jury trial on them.

N.C.Gen.Stat. § 153A-435(b).

Thus, not only does North Carolina have a general interest over enforcement and interpretation of contracts of insurance, North Carolina has made specific provision for resolution of all "issues of law or fact" relating to liability insurance secured by a county. Clearly, there are both issues of law and fact related to the policy at issue here, inasmuch as both the Complaint and the Counterclaims call upon

this court to determine whether there were two accidents as well as the limits of

indemnification under the policy.  This factor weighs heavily in favor of dismissal.[3]


### C.    The Second and Third Factors: Judicial Efficiency and Court Entanglement.

Determination of whether there was one or two accidents, whether automobile

part of the policy provides actual indemnification of $1,000,000.00 or $2,000,000.00,

and whether the law enforcement provision provides additional coverage of up to

$2,000,000.00 will require review of all the pleadings in the Frye and Huskins

actions, production and review of the lengthy transcript of the trial in the Frye action,

and more likely than not a lengthy evidentiary hearing in this court on the issue of

whether there was one accident or two.  Further, this court could conceivably be

called upon to revisit any decision it would make based on the discovery of new

evidence in the trial of the Huskins Action, which has yet to be tried.

On the other hand, Judge Baker has already heard all the evidence and appears

poised to determine the extent of coverage available under the policy, as required

---

[3]    In light of the resolution of this motion, infra, the court has purposely not addressed what North Carolina law, as the parties have expertly done, will be applicable to resolution of the limit of indemnification available under the policy. The court specifically leaves this to the state court to resolve, thereby avoiding further federal entanglements.

under Chapter 152A-435.  Thus, it is clearly wasteful of limited court resources for this court to hear evidence which a most capable state court trial judge has already heard.  In considering judicial efficiency, the court has also considered the expenditure of resources by the parties.  While plaintiff is without doubt capable of funding this action, the court takes notice that both the Frye and Huskins defendants are probably working families of modest means.  Even though this court is not privy to the financial arrangements between such defendants and their counsel, proceedings in this court will involve substantial additional costs as well as time away from family and work that may not be necessary if the issues raised herein were submitted to Judge Baker.

The primary concern expressed in <u>Nautilus</u> is not the timing of actions, but whether courts are being asked to decide issues *ad hoc*. The court believes that in the context of <u>Nautilus</u>, which is further illuminated by both <u>Wilton</u> and <u>Brillhart</u>, efficiency means the efficient use of *all* court resources. Common sense counsels against a second court conducting a second trial  to determine whether one or two accidents occurred and the indemnification limits of a policy of insurance.  It is very likely that Judge Baker, who can recall the evidence he heard at trial, can make that decision promptly.

Further, piecemeal litigation is particularly draining on scarce judicial resources. Honorable Lacy H. Thornburg, United States District Judge, held in Hartford Casualty Insurance Company v. BB&T Financial Corporation, 131 F. Supp.2d 752 (W.D.N.C 2001), as follows:

> [t]he second and third [Nautilus] factors, along with the prohibition against trying a controversy by piecemeal, are particularly salient. While it is true that this Court could efficiently adjudicate the rights and responsibilities between [the parties to this action], the rights of all of the parties involved in the underlying dispute can be resolved in the single action now pending in South Carolina state court.

Hartford, supra, at 755 (emphasis deleted). Unlike the case in Hartford, the undersigned finds that this court cannot "efficiently adjudicate" this controversy inasmuch as it will require resolution of a pivotal fact, which is whether the Fryes and the Huskins were injured as a result of one or two accidents caused by the negligence of one of plaintiff's insureds. The district court in Hartford further found that dismissal was appropriate where the coverage of the policies would have to be addressed by the state court in any event:

> the South Carolina action would nonetheless have to continue to determine the rights of the other parties. By staying this proceeding, the Court can avoid unnecessary entanglement of the State and Federal courts in this matter. Judicial resources—arguably in each system—would be most efficiently allocated by allowing the South Carolina state court the opportunity to determine the respective obligations of all of the insurers with potential liability stemming from the [association's] lawsuit.

Id. Even if this court were to determine the merits of this action, it appears that Judge

Baker would still be required to conduct the statutorily required hearing to determine

extent to which the county has waived its governmental immunity. Thus, this court's

decision would be unnecessarily entangled with the decision of a state court on an

issue fundamental to state jurisprudence, governmental immunity.

Further, the entry of a declaratory judgment in this case would likely not be the

end of the federal action. First, as mentioned briefly above, it is very possible that

additional evidence would be produced in the trial of the Huskins Action, which

would not likely be tried until this action is resolved, and could result in the

production of evidence forming the basis of a Rule 60(b)(2) motion for relief from

judgment.[4] Second, based on the amounts in controversy and the very real probability

that the Chapter 153A-435 hearing could result in a substantial *remittitur* of the jury's

verdict based on the federal decision, an appeal of any declaratory judgment decision

---

[4]     Rule 60(b)(2) provides that:

On motion and just terms, the court may relieve a party or its legal
representative from a final judgment, order, or proceeding for the
following reasons:

* * *

(2)     newly discovered evidence that, with reasonable
diligence, could not have been discovered in time to
move for a new trial under Rule 59(b) . . . .

Fed.R.Civ.P. 60(b)(2).

to the Court of Appeals for the Fourth Circuit is not only likely, it is probable. Such could take years to resolve and it appears most unlikely that the judgment would be compromised between the parties in such period inasmuch as interest will not accrue on the state court award until judgment is entered.

Finally, under this factor, the court has considered federalism, which is the sharing of power and authority between a national and a state government. Although arising as a federal challenge to state criminal law, the Supreme Court has clearly set forth the limitations of federal court action based on federalism in <u>Younger v. Harris</u>, 401 U.S. 37 (1971):[5]

> Since the beginning of this country's history Congress has, subject to few exceptions, manifested a desire to permit state courts to try state cases free from interference by federal courts.
>
> * * *
>
> The precise reasons for this longstanding public policy against federal court interference with state court proceedings have never been specifically identified but the primary sources of the policy are plain. One is the basic doctrine of equity jurisprudence that courts of equity should not act . . .when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief. The doctrine may originally have grown out of circumstances peculiar to the English judicial system and not applicable in this country, but its fundamental purpose of restraining equity jurisdiction within narrow limits is equally important under our Constitution, in order to prevent erosion of the role of the jury and avoid a duplication of legal proceedings and legal sanctions where a single suit would be adequate to protect the rights asserted. This underlying reason for restraining

---

[5] <u>Younger</u> is invoked only for its explanation of federalism not abstention.

courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of 'comity,' that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. This, perhaps for lack of a better and clearer way to describe it, is referred to by many as 'Our Federalism' . . . . What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

Id., at 43-45.  In considering whether this court should exercise its discretion in favor of proceeding with the declaratory judgment action, the court has considered federalism and concludes that if it were to proceed with this action it would unduly interfere with legitimate activities of the state, which include interpretation of contracts of insurance and determination the extent to which one of its counties has waived governmental immunity, but also with the state court's ability to promptly move from verdict and enter a judgment on a case it has heard.  Indeed, to proceed with this action at end of one state court action and in the middle of a related state court action would undermine the state court system of justice, a result clearly not in keeping with the "manifested . . .desire [of Congress] to permit state courts to try state cases free from interference by federal courts."  Id.

Thus, considerations of judicial economy, efficiency and federalism weigh heavily against this court's hearing of the declaratory judgment action.

**D.  The Fourth Factor: *Res Judicata*.**

The fourth factor requires consideration of whether the declaratory judgment action is being used merely as a device for procedural fencing—that is, to provide another forum in a race for *res judicata* or to achieve a federal hearing in a case otherwise not removable. Unlike intellectual property litigation, where the race to the courthouse is paramount, Genentech, Inc. v. Eli Lilly and Co., 27 U.S.P.Q.2d 1241 (Fed. Cir. 1993), abrogated on different grounds, Wilton, supra,  little significance is given to this fact even where the federal declaratory judgment action was filed prior to parallel state declaratory action. Centennial, supra, at 258 ("although the federal action was filed first, we decline to place undue significance on the race to the courthouse door...."). This action was filed August 7, 2008, after the state court actions were filed.  See Hartford, at 754.

Based on what is now before the court, it does not appear to the undersigned that this action was filed in an attempt to delay proceedings in state court, compound costs, or frustrate the victims in the state court proceeding by making them litigate issues in two courts.  Clearly, counsel for plaintiff would not do such things.  Instead, it appears more likely that this action was filed in this court for the same reasons most

foreign litigants file actions in federal court under diversity: a belief that a corporation foreign to a state will find a more neutral forum in federal court. While accepting this as the rational for the federal finding, the court does not agree with that assumption. The undersigned has tried more than a dozen jury trials before Judge Baker since he took the bench and, before that, defended hundreds of criminal cases prosecuted by Judge Baker when he was the state prosecutor. The undersigned knows, first hand, that Judge Baker is an impartial jurist regardless of where a party may be from, what business in which a party may be engaged, and which side a person may be on. Questions of North Carolina law could not be in better hands than those of Judge Baker.

### E. Conclusion

The filing of this action was perfectly reasonable and understandable inasmuch as plaintiff has a real interest in a determination of the extent of their obligation to indemnify the county. Plaintiff has not been able to show, however, that this issue cannot be resolved by the state court or that it would be more efficient for this court to resolve the issue. While it is implicit that this action was filed to avoid perceived bias directed to an out-of-state litigant in state court, such reason is not compelling based on this court's own knowledge wrought from years of legal experience with Judge Baker as both an opponent and a jurist. Not only is the state court uniquely

qualified to determine the issue presented herein, it has already laid the groundwork for decision making inasmuch as it has heard the extensive evidence presented at trial.

The natural instinct of any federal judge, however, is to decide the matter over which it has jurisdiction and close this case. Contract interpretation is much less painful than the nuances of discretion involved in dismissal; however, the time and expense of reviewing all the evidence presented in the Frye trial and the possibility that this action will delay Judge Baker's entry of judgment for possibly years cries out for this court declining to exercise its jurisdiction. To do otherwise in these circumstances would not only go against the logic of Nautilus and the principles of federalism, it would work an injustice as well as a hardship on the families who have not only suffered loss, but who have had to endure and relive the tragic events of February 7, 2007, in the prosecution of their actions. To require them to do so again in this court would simply be cruel.

Under the Nautilus factors, it is not a question of whether a court "can" resolve an issue but, rather, a question of whether it "should." The greater interests in comity, deference, and economy require this court to allow courts of the State of North Carolina to resolve the question presented. Having used the Nautilus factors as a framework, weighed each factor carefully, and closely reviewed the well-reasoned and well-written arguments of respective counsel, the undersigned must, respectfully,

decline to exercise its jurisdiction, grant defendants' Motion to Dismiss, and dismiss

this action as well as the counterclaims without prejudice as to refiling in state court.

A judgment consistent with this Memorandum of Decision is entered simultaneously

herewith.

Signed: May 19, 2009

Dennis L. Howell
United States Magistrate Judge